CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB 22 2022

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| DANVILLE REGIONAL MEDICAL CENTER, LLC and CLINCH VALLEY MEDICAL CENTER, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:21-cv-00012 |
| v. | ) ) ) | **MEMORANDUM OPINION** |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, | ) ) ) | By:   Hon. Thomas T. Cullen United States District Judge |
| Defendant. | ) ) | |

When COVID-19 first arrived in the United States, local, state, and federal governments imposed far-reaching regulations to combat the novel threat to public health and safety. Although these regulations dramatically altered everyday life, most fervently hoped (and believed) that the COVID-19 pandemic, and these restrictions, would be ephemeral. Unfortunately, this did not turn out to be the case.

Two years on, COVID-19 still poses a threat, albeit a reduced and much more manageable one, to the public. Besides the drastic changes to our sense of "normalcy," the pandemic has wreaked havoc on the healthcare system. Doctors, nurses, support and custodial staff, and others have worked tirelessly to care for everyone who has faced illness during this pandemic—COVID-19 infections or otherwise.

The pandemic has also upended many hospitals' business models. In addition to increased patient loads, staffing shortages, and heightened cleaning protocols, state and local governments imposed various shutdowns and other requirements that resulted in the

cancellation of many elective procedures. At the same time their revenues dwindled, hospitals and other medical facilities were forced to bear increased costs related to the pandemic. These pressures severely affected hospitals' profitability.

To offset these financial losses, hospitals (like Plaintiffs in this case) submitted claims under their various insurance policies. This case concerns whether one such policy covers the alleged losses sustained as a result of the COVID-19 pandemic. For the reasons discussed more fully below, the court finds that two of the three coverage provisions are not implicated by the facts alleged by Plaintiffs. The court will accordingly dismiss claims related to both the Biocontamination and Decontamination Costs provisions of the applicable insurance policy. Because there is no independent argument to dismiss the claims related to the Interruption by Communicable Disease provision, Plaintiffs' claim as to that provision will survive.

## I.

The facts are taken from Plaintiffs' complaint and, at this stage, are presumed to be true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While factual assertions are entitled to this assumption of truth, legal conclusions couched as factual assertions receive no deference. *See id.*; *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (stating that, on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

Plaintiffs Danville Regional Medical Center, LLC ("DRMC") and Clinch Valley Medical Center, Inc. ("CVMC") (collectively "Plaintiffs") operate medical centers in Virginia. (Compl. ¶¶ 4–5 [ECF No. 1].) DRMC operates "Sovah Health—Danville" and "Sovah Health—Martinsville" in southside Virginia, and CVMC is located in in Richlands, Virginia. (*Id.*) Both DRMC and CVMC are subsidiaries of LifePoint Health, Inc. ("LifePoint"), "an

organization of affiliated entities that own and operate hospitals and other healthcare providers in more than eighty communities across the United States" that is headquartered in Tennessee. (*Id.* ¶ 6.) Defendant American Guarantee and Liability Insurance Company ("Zurich" or "Defendant") is an insurance company that "sells policies of insurance, including property and business interruption insurance policies." (*Id.* ¶ 8.) The parties agree that complete diversity exists and that this court has jurisdiction over this case under 28 U.S.C. § 1332.

In December 2019, the COVID-19 outbreak began. COVID-19 is a highly transmissible disease that, to date, has infected over 400 million people worldwide and is responsible for the deaths of almost 6 million.[1] The virus can spread through both symptomatic and asymptomatic individuals, and one of the primary modes of transmission is through "respiratory droplets" that spread "when an infected person talks, sneezes, or coughs[.]" (*Id.* ¶ 18 (citing the Centers for Disease Control and the World Health Organization). Plaintiffs contend that, "[a]lthough these virus-containing droplets are very small, they are still physical objects that can travel and attach to other surfaces and cause harm, loss, and damage, and these droplets physically exist ubiquitously in the communities and facilities in which Plaintiffs operated and continue to operate." (*Id.* ¶ 21.)

On March 11, 2020, the World Health Organization "declared the COVID-19 outbreak a worldwide pandemic." (*Id.* ¶ 25.) On March 25, the Governor of Virginia and the Virginia Health Commissioner issued an Executive Order ("the Virginia Order")

> prohibiting all inpatient and outpatient surgical hospitals licensed under 12 VAC 5-410, free-standing endoscopy centers, physicians' offices, and dental, orthodontic, and endodontic

---

[1] World Health Organization, *Coronavirus disease (COVID-19)*, available at www.who.int/emergencies/diseases/novel-coronavirus-2019 (last accessed Feb. 18, 2022).

> offices in the Commonwealth from providing procedures and surgeries that require PPE [personal protective equipment], which if delayed, are not anticipated to cause harm to the patient by negatively affecting the patient's health outcomes, or leading to disability or death.

(*Id.* ¶ 27.) "The Virginia Order suspended or slowed down many of Plaintiffs' business activities at their respective medical centers, including medical procedures and surgeries, and prohibited use of or access to significant portions of the properties for these and other business activities due to the threat of spread of COVID-19 . . . ." (*Id.* ¶ 28.) These prohibitions "generated substantial losses by reducing access to the medical centers for various procedures and surgeries, causing reduced revenue, EBITDA[2] and income at Plaintiffs' respective medical centers." (*Id.* ¶ 29.)

From June 1, 2019, to June 1, 2020, LifePoint was covered under a $650 million Zurich insurance policy[3] ("the Policy") "[t]o protect against property damage, threats of imminent physical property loss, and interruptions to Plaintiffs' businesses . . . ." (*Id.* ¶ 31.) Both DRMC and CVMC are "Named Insureds under the Policy, and the Policy insures all of Plaintiffs' medical centers in Virginia as Insured Locations." (*Id.* ¶ 33.) The Policy "insures against all risks of direct physical loss, damage or destruction occurring during the term of [the Policy] to the type of property insured." (*Id.* ¶ 35; *id.* Ex. A p. 26 [ECF No. 1-1].)

---

[2] Although not defined in Plaintiffs' complaint, "EBITDA" is generally accepted to mean "earnings before interest, taxes, depreciation, and amortization." *See, e.g.*, *In re: Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 747 n.3 (4th Cir. 2021).

[3] The policy "was underwritten on a quota-share basis by [Zurich], Liberty Mutual Fire Insurance Company . . . , and Lexington Insurance Company . . . ." (Compl. ¶ 31.) This structure is not relevant to the court's analysis.

The Policy contained several express provisions that Plaintiffs contend were implicated by the COVID-19 pandemic and the Virginia Order. The first, the "Biocontamination Extension," states:

> To the extent not otherwise provided herein, this Policy insures physical loss, damage or destruction of insured property by "biocontamination" arising from material used or stored or from processes conducted by the Insured.
>
> As used herein, "biocontamination" shall mean the sudden and accidental discharge, dispersal, seepage, migration, release or escape of biological agents or materials used in or resulting from activities of the Insured involving living organisms including, but not limited to, viruses, bacteria, fungi, mold and infective agents.

(*Id.* Ex. A. p. 31.) The second provision—Decontamination Costs—provides:

> If insured property is contaminated as a direct result of physical damage insured by this Policy and there is in force at the time of the loss any law or ordinance regulating Contamination due to the actual not suspected presence of Contaminant(s), then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance. This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of Contaminant(s) as a direct result of insured physical damage.
>
> The Company is not liable for the costs required for removing contaminated uninsured property nor the Contaminant therein or thereon, whether or not the Contamination results from an insured event.

(*Id.* Ex. A. pp. 33–34.) And the final provision Plaintiffs contend is implicated is the Interruption by Communicable Disease ("ICD") provision, which states:

> The Company will pay for the actual Gross Earnings loss sustained by the Insured, as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if the **Suspension** is caused by

> order of an authorized governmental agency enforcing any law or ordinance regulating communicable diseases and that such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the Location.
>
> This Policy also covers the reasonable and necessary cost incurred for the cleanup, removal and disposal of the actual not suspected presence of substance(s) causing the spread of such communicable disease and to restore the locations in a manner so as to satisfy such authorized governmental agency.
>
> This Coverage will only apply when the period of time that access is prohibited exceeds the time shown as Waiting Period in the Waiting Period clause of the Declarations section. If the Waiting Period is exceeded, then this Policy will pay for the amount of loss in excess of the Policy Deductible, but not to exceed the number of consecutive days following such order as stated in the Declarations up to the limit applying to this Coverage.
>
> This Coverage will not apply to loss or damage that is payable under any other provision in this Policy.
>
> Definitions:
>
> **Suspension** (Suspended) – The slowdown or cessation of the Insured's business activities: or as respects rental income that a part or all of the Insured Location is rendered untenantable.

(*Id.* Ex. A p. 118 (emphasis in original).)

Following implementation of the Virginia Order, Plaintiffs filed a claim with Zurich on August 25, 2020, claiming coverage under the Biocontamination Extension, Decontamination Costs, and ICD provisions of the Policy. (*See id.* ¶ 58.) Zurich denied coverage under the Biocontamination Extension because it contended COVID-19 "is not a material used or stored by the insured, does not arise from any processes conducted by the insured, and is not used in or resulting from any processes conducted by the insured." (*Id.* ¶ 62.) It further explained that COVID-19 "is not 'physical damage of the type insured' under the

- 6 -

Biocontamination Extension." (*Id.*) As to the Decontamination Costs provision of the Policy, Zurich denied the claim, explaining that that provision "'requires physical damage insured by the [P]olicy and a law or ordinance regulating contamination in force at the time of the loss,' and that . . . Plaintiffs [had] 'not provided facts meeting these requirements.'" (*Id.* ¶ 64.)

During the preliminary stages of this litigation, the parties disputed whether Plaintiffs' claim for coverage under the ICD provision was ripe. Zurich contended that it had not decided that claim, arguing that the claim was still under internal review. Plaintiffs argued that Zurich had implicitly denied their claim, and contended that Zurich had acted in bad faith in refusing to waive a suit limitation provision that required that a lawsuit challenging a denial be brought within one year of the loss.[4] After oral argument on the present motion, the court stayed the case to permit Zurich to made a final determination, while also preserving Plaintiffs' right to file suit without regard to the suit-limitation provision they contended was hamstringing them. The parties now agree, after the court-ordered stay, that Zurich has denied the ICD claim and that that claim is ripe for this court's review. (*See* Joint Status Report ¶ 6, Dec. 9, 2021 [ECF No. 43].)

On January 31, 2021, Plaintiffs brought suit in this court alleging two causes of action: Count 1 seeks a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, that

---

[4] Because the Virginia Order was implemented in March 2020, Plaintiffs contended they had until March 2021, at the latest, to bring the present suit. As of January 29, 2021, Zurich still had not made a determination on the merits of the ICD claim, and Plaintiffs allege they were in the "process of gathering additional information responsive to Zurich's voluminous requests" less than two months before the suit-limitations period was set to expire. (Compl. ¶ 67.) Plaintiffs requested an extension to the suit limitations period, but Zurich denied that request. When Plaintiffs filed this suit on March 1, 2021, just two weeks before the suit-limitations period expired, Zurich maintained that it still had not made a determination on the merits of the ICD claim. Rather than wait for an official denial letter—and risk that letter coming after the suit-limitations period had expired—Plaintiffs' included the ICD claim in this suit, arguing that Zurich had implicitly denied the claim by failing to act on it.

Zurich is obligated "to provide insurance coverage for the losses of Plaintiffs incurred from mid-March 2020 forward under the [ICD] endorsement, the Biocontamination Extension, and the Decontamination Costs coverage provision"; and Count 2 alleges breach of contract related to Zurich's denials of coverage under all three cited provisions. (*See generally* Compl. ¶¶ 71–80.) Zurich has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), and the court heard oral argument on the motion on August 27, 2021. Following the court-ordered stay that was lifted on December 9 (*see* ECF No. 44), the matter is ripe for disposition.

## II.

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

## III.

### A.

The parties dispute whether Virginia or Tennessee law applies to this action. Zurich contends that Tennessee law should apply since LifePoint is headquartered in Tennessee and the Policy was executed and delivered there. Plaintiffs argue that "[i]n Virginia, an insurance contract 'on or with respect to the ownership, maintenance or use of property in [Virginia] shall be deemed to have been made in and shall be construed in accordance with the laws of [Virginia].'" *Factory Mut. Ins. Co. v. Liberty Mut. Ins. Co.*, 518 F. Supp. 2d 803, 808–09 (W.D. Va. 2007) (citing Va. Code Ann. § 38.2-313)).

"In a diversity action, district courts apply federal procedural law and state substantive law." *Elegant Massage, LLC v. State Farm Auto. Ins. Co.*, 506 F. Supp. 3d 360, 368 (E.D. Va. 2020) (citing *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005)). Because this action was filed in Virginia, Virginia's choice-of-law rules apply. *Id.*

Generally speaking, "[t]he Virginia choice of law rules for the interpretation of insurance contracts is that those contracts are governed by the law of the state in which the insurance contract is made." *Asbestos Removal Corp. of Am., Inc. v. Guar. Nat'l Ins. Co.*, 846 F. Supp. 33, 34–35 (E.D. Va. 1994) (citing *Rossman v. State Farm Mut. Auto. Ins. Co.*, 832 F.2d 282, 287 (4th Cir. 1987)). "Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004). "[T]he law of the place where an insurance contract is written and delivered controls issues as to its coverage." *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993).

The parties dispute which law should govern: Virginia or Tennessee. Zurich contends that Tennessee law applies, while Plaintiffs argues for Virginia. Plaintiffs' complaint does *not* allege where the insurance contract was "delivered"; the complaint alleges that the Policy was "sold to Plaintiffs in exchange for premiums paid" (Compl. ¶ 1), and that the Policy was "effective during the period from June 1, 2019 to June 1, 2020" (*id.* ¶ 32), but there are no allegations regarding the signing or "delivery" of the Policy. In some cases, the court may infer where delivery took place, *see, e.g.*, *Puryear v. Hartford Ins. Co. of the S.E.*, No. 2:19cv00009, 2019 WL 1474014, at *2 n.3 (W.D. Va. Apr. 3, 2019), but that is only proper when the opposing party does not dispute what law governs the contract.

In arguing for the application of Virginia law, Plaintiffs point to Va. Code Ann. § 38.2-313, which states: "All insurance contracts on or with respect to the ownership, maintenance or use of property in this Commonwealth shall be deemed to have been made in and shall be construed in accordance with the laws of this Commonwealth." And courts applying Virginia law to insurance policies covering Virginia locations cite this statute for support. *See, e.g.*, *Factory Mut. Ins. Co.*, 518 F. Supp. 2d at 808–09 (citing Va. Code Ann. § 38.2-313 and applying Virginia law to insurance policies covering a facility located in Virginia); *Sewarz v. First Liberty Ins. Corp.*, No. 3:10cv120, 2012 WL 12438, at *1 (E.D. Va. Jan. 3, 2012) (applying Virginia law to the claim of "breach of the insurance contract for Sewarz's home in Virginia"). To be sure, by enacting Va. Code Ann. § 38.2-313, "it appears that the Virginia General Assembly intended to alter the general rule regarding interpretation of insurance contracts . . . ." *City Ins. Co. v. Lynchburg Foundry Co.*, No. 88-0178-L, 1989 WL 1102787, at *2 (W.D. Va. Apr. 25, 1989)

(applying Virginia law to a dispute over an insurance contract that "was issued in Atlanta, Georgia").

The point, however, "is probably academic in any event," *id.* at *3, because for the reasons discussed more fully below, Plaintiffs have failed to state claims for breach of the Biocontamination and Decontamination Costs provisions under the laws of either Virginia or Tennessee.

**B.**

Both Virginia and Tennessee treat insurance contracts as any other contract and strive to give the normal meaning to the words used. *See Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 354–55 (Va. 2019); *Purkey v. Am. Home Assur. Co.*, 173 S.W.3d 703, 705 (Tenn. 2005). When policy language is not ambiguous, courts enforce the contract's terms. *Smith v. Smith*, 351 S.E.2d 593, 595 (Va. Ct. App. 1986) ("When the terms of a disputed provision are clear and definite, it is axiomatic that they are to be applied according to their ordinary meaning."); *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) ("If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes."). When terms in an insurance contract are ambiguous, meaning they are open to more than one interpretation, ambiguities are generally construed against the drafter and in favor of granting coverage. *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012); *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn. 1993).

With regard to the Biocontamination and Decontamination Costs provisions, Zurich argues that, in the absence of "physical loss, damage or destruction" (as to the Biocontamination provision) or "physical damage" (as to the Decontamination Costs

provision), neither provision is implicated and Plaintiffs have failed to state a claim for breach of those provisions. Zurich contends that the potential presence of the COVID-19 virus on surfaces in Plaintiffs' hospitals is not "physical damage" because the structural integrity of the Insured Premises is not altered in any way.

After review of the relevant contractual provisions, the court finds that the terms "physical loss, damage or destruction" and "physical damage" are not ambiguous, and that the potential presence of COVID-19 in Plaintiffs' facilities does not amount to "physical loss, damage or destruction" or "physical damage" of the insured property. Those terms require some change to the nature of the insured property that necessitates either repair or replacement to restore the property to full functionality. The COVID-19 virus does not and cannot cause such damage. Likewise, the Virginia Order did not cause "physical loss, damage or destruction" or "physical damage" to insured property.

The overwhelming weight of authority favors this interpretation, and federal courts applying both Virginia and Tennessee law agree. In *1210 McGavock Street Hospitality Partners, LLC v. Admiral Indemnity Co.*, a federal district court applying Tennessee law held that the phrase "direct physical loss of or damage to Covered Property" was not an ambiguous phrase, and held that the plaintiff could not show that the government's closure orders—or COVID itself—caused "direct physical loss of or damage to Covered Property." 509 F. Supp. 3d 1032, 1041–43 (M.D. Tenn. 2020). And just this month, the Chief Judge of this court, construing a Zurich policy almost identical to the one at issue in this case, concluded that "losses due to the COVID-19 pandemic are not direct physical losses to . . . property covered under" a

Zurich insurance policy. *Carilion Clinic v. Am. Guar. & Liab. Ins. Co.*, No. 7:21cv00168, 2022 WL 347617, at *14 (W.D. Va. Feb. 4, 2022).

Courts across the country are virtually unanimous is this holding, in COVID-19 cases and other, related contexts. *See, e.g.*, *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, No. 21-1082-cv, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022) ("Even assuming the virus's presence at Kim-Chee's tae-kwon-do studio, the complaint does not allege that any part of its building or anything within it was damaged—let alone to the point or repair, replacement, or total loss."); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 458 (5th Cir. 2022) (concluding that "the Texas Supreme Court would interpret a direct physical loss of property to require a tangible alteration or deprivation of property. Because the civil authority orders prohibiting dine-in services at restaurants did not tangibly alter TBB's restaurants, . . . the policy does not provide coverage for TBB's claimed losses"); *Aggie Invs., LLC v. Cont'l Cas. Co.*, No. 21-40382, 2022 WL 257439, at *3 (5th Cir. Jan. 26, 2022) (per curiam) ("'[D]irect physical loss of property' unambiguously requires a tangible alteration or deprivation of property."); *Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 700 (6th Cir. 2022) ("Estes does not request a dime of payment for property losses (whether to its office buildings or the items within those buildings). Rather, Estes seeks only the income it lost and the expenses it incurred as a result of COVID-19 and government restrictions. But Estes bought a *property* insurance policy, not a *profit* insurance policy."); *Ascent Hosp. Mgmt. Co. v. Emps. Ins. Co. of Wausau*, No. 21-11924, 2022 WL 130722, at *3 (11th Cir. Jan. 14, 2022) (per curiam) ("The district court correctly explained that 'direct physical loss or damage requires an actual physical change to property that COVID-19 particles cannot cause' because a contaminated location can be immediately

restored to its previous state by cleaning and disinfecting—no repair or replacement required."); *10012 Holdings, Inc. v. Sentinel Ins. Co.*, 21 F.4th 216, 222 (2d Cir. 2021) ("[T]he terms 'direct physical loss' and 'physical damage' . . . do not extend to mere loss of use of a premises, where there has been no physical damage to such premises; those terms instead require actual physical loss of or damage to the insured's property."); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021) (finding that an insurance policy that required a "direct physical loss" was not implicated by COVID-19 because the restaurant had not been "tangibly destroyed, whether in part or in full"); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 20 F.4th 327, 333 (7th Cir. 2021) (holding that "'direct physical loss' requires a physical alteration to property"); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141, 1145 (8th Cir. 2021) (finding no ambiguity and concluding that "[t]he policy clearly does not provide coverage . . . absent a showing of direct physical loss or physical damage"); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 892 (9th Cir. 2021) ("Mudpie alleges the Stay at Home Orders temporarily prevented Mudpie from operating its store as it intended, and urges us to interpret 'direct physical loss of or damage to' to be synonymous with 'loss of use.' We cannot endorse Mudpie's interpretation . . . ."); *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 710 (10th Cir. 2021) (regarding a COVID-19 insurance claim: "The Business Income provision unambiguously covered only losses stemming from physical alteration or tangible dispossession of property. Neither occurred here."); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021) ("[W]e do not see how the presence of those particles would cause physical damage or loss to the property."); *Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. Aug.

18, 2020) (holding that a "structure that merely needs to be cleaned has not suffered a 'loss' which is both 'direct' and 'physical'"); *Conn. Child.'s Med. Ctr. v. Cont'l Cas. Co.*, No. 3:21-cv-291, 2022 WL 168786, at *6 (D. Conn. Jan. 19, 2022) ("In short, whether the theory is based on 'loss of use' of property or based on 'physical damage' from the COVID-19 virus itself, the result is the same: there is no 'direct physical loss or damage' to property."); *Olmsted Med. Ctr. v. Cont'l Cas. Co.*, No. 21-1309, 2022 WL 126336, at *7 (D. Minn. Jan. 13, 2022) ("Olmsted's claim of physical loss or damage based on persons testing positive for COVID-19 or the presence of the virus in its buildings fails."); *Palomar Health v. Am. Guar. & Liab. Ins. Co.*, No. 3:21-cv-00490, 2021 WL 4035005, at *8–9 (S.D. Cal. Sept. 3, 2021) ("[T]he presence of the SARS-COV-2 virus on the covered property cannot realistically be viewed as a risk to the physical integrity of the structures. . . . [T]he presence of the SARS-COV-2 virus and COVID-19 patients does not constitute direct physical loss of or damage to Palomar's property. Nor does the presence of the virus or patients constitute a risk of damage or physical loss."); *Northwell Health, Inc. v. Lexington Ins. Co.*, No. 21-cv-1104, 2021 WL 3139991, at *5 (S.D.N.Y. July 26, 2021) ("Northwell alleges that respiratory droplets carrying the coronavirus attach to surfaces, linger there, and 'thus compromise[ ] the physical integrity of the structures it permeates' and renders those structures 'unusable.' However, the Complaint does not allege any facts supporting the conclusion that the coronavirus compromises the physical integrity of objects by harming surfaces and structures, as opposed to harming the people who touch them.") (internal citation omitted) (alteration original); *Valley Health Sys., Inc. v. Zurich Am. Ins. Co.*, No. BER-L-1907-21, 2021 WL 4958349, at *5 (N.J. Super. Ct. Law Div. Oct. 18, 2021) ("[F]or the presence of a contaminant to constitute a direct physical loss of or damage to

property, the substance must permeate the premises to distinctly and demonstrably compromise its physical integrity or render it entirely uninhabitable for a distinct period of time. This threshold has not been met here. The government orders are what caused Plaintiffs to be unable to fully use their properties, however, it was not because of any physical casualty to the property itself. Thus, as a matter of law, the claim that a harmful substance is present is insufficient to establish direct physical loss or damage to property."). *But see Novant Health, Inc. v. Am. Guar. & Liab. Ins. Co.*, No. 1:21-cv-309, 2021 WL 4340006, at *3 (M.D.N.C. Sept. 23, 2021) (holding that "[w]hether COVID-19 has resulted in direct physical damage or loss to Novant, and if so to what extent, are questions better evaluated on a developed factual record. Novant has adequately alleged direct physical damage or loss, and dismissal on this basis is inappropriate at the Rule 12(b)(6) stage"); *Elegant Massage*, 506 F. Supp. 3d at 372–76 (applying Virginia law, finding the phrase "direct physical loss" ambiguous, and holding that "while the [plaintiff's business] was not structurally damaged, it is plausible that Plaintiff's [*sic*] experienced a direct physical loss when the property was deemed uninhabitable, inaccessible, and dangerous to use by the Executive Orders because of its high risk for spreading COVID-19, an invisible but highly lethal virus").

To be sure, Plaintiffs pay lip-service to these contractual requirements, but their allegations are nothing more than a pleading consisting of "labels and conclusions" and "naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). Plaintiffs allege that virus-containing droplets "can travel and attach to other surfaces and cause harm, loss, and damage" (Compl. ¶ 21), and they allege that, as a result of the "biocontamination" of COVID-19, they "have had to take various measures

to remedy the physical loss, damage or destruction their medical centers suffered, including . . . property replacement and/or repair . . . ." (*id.* ¶ 49). The court—and Zurich—is left to guess what the nature of the repair is and how virus-containing droplets caused any such damage. This bare-bones assertion of causation is insufficient, particularly in light of the overwhelming weight of authority holding that COVID-19 cannot cause the type of damage that Plaintiffs generally allege.

Because the Biocontamination Extension and Decontamination Costs provisions both require some sort or physical damage or loss as a prerequisite to coverage, and because Plaintiffs have failed to allege such damage, claims relating to both provisions will be dismissed.

## C.

Zurich purportedly sought dismissal of claims relating to the ICD under both Rules 12(b)(1) and 12(b)(6). The company has withdrawn its ripeness argument under 12(b)(1). (*See* Def.'s Not. of Withdrawal, Dec. 15, 2021 [ECF No. 46].) In its withdrawal of the 12(b)(1) argument, Zurich said it was "withdrawing the 12(b)(1) portion of its Motion to Dismiss, leaving only the 12(b)(6) arguments for resolution by the Court." (*Id.*) The ICD provision does not have a requirement of physical loss or damage, and Zurich did not make an independent 12(b)(6) argument addressed to the ICD claim. Accordingly, counts 1 and 2 will proceed on the ICD claim only.

## IV.

Because the terms of the Policy between Plaintiffs and Zurich are unambiguous and because Plaintiffs have not alleged physical loss or damage as a result of COVID-19, Plaintiffs'

claims for a declaratory judgment and breach of contract related to the Biocontamination Extension and Decontamination Costs provision will be dismissed. Counts 1 and 2 survive only as they relate to the Policy's ICD provision.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 22nd day of February, 2022.

>  */s/ Thomas T. Cullen*  
> HON. THOMAS T. CULLEN  
> UNITED STATES DISTRICT JUDGE