IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
NOV 14 2022
LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

| | |
|---|---|
| DANVILLE REGIONAL MEDICAL CENTER, LLC and CLINCH VALLEY MEDICAL CENTER, INC., | |
| Plaintiffs, | Case No. 4:21-cv-00012 |
| v. | **MEMORANDUM OPINION** |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, | By:  Hon. Thomas T. Cullen United States District Judge |
| Defendant. | |

This is not the first time this court has been asked to decide whether the COVID-19 pandemic—and attendant government shut-down orders—implicated an insurance policy, and it surely will not be the last. As it relates to the policy presently before the court, the plain terms of the parties' agreement simply do not cover the restrictions placed on Plaintiffs' hospitals. Accordingly, Plaintiffs Danville Regional Medical Center, LLC, and Clinch Valley Medical Center, Inc. (collectively "Plaintiffs") are not entitled to summary judgment, and their motion for partial summary judgment will be denied.

I.

Given the detailede factual recitation in the court's prior opinion (*see* Mem. Op. pgs. 1–8, Feb. 22, 2022 [ECF No. 53]), only the relevant details are recounted here. Plaintiffs are parties to an insurance policy contract ("the policy") with Defendant American Guarantee and Liability Insurance Company ("AGLIC") that includes an "Interruption by Communicable Disease," or "ICD," endorsement provision:

INTERRUPTION BY COMMUNICABLE DISEASE

The Company [AGLIC] will pay for the actual Gross Earnings loss sustained by the Insured [Plaintiffs], as provided by this Policy, resulting from the necessary **Suspension** of the Insured's business activity at an Insured Location if the **Suspension** is caused by order of an authorized governmental agency enforcing any law or ordinance regulating communicable disease and that such portion of the location are declared uninhabitable due to the threat of the spread of communicable disease, prohibiting access to those portions of the Location.

. . .

Definitions:

**Suspension** (Suspended) – The slowdown or cessation of the Insured's business activities: or as it respects rental income that a part or all of the Insured Location is rendered untenantable.

(Compl. Ex. A [ECF No. 1-1].) At the outset of the COVID-19 pandemic, Virginia's then-Governor issued several executive orders intended to curb the spread of the contagious disease. Plaintiffs contend that one such order, Order of Public Health Emergency Two ("the Virginia Order"), triggered the ICD endorsement:

> [T]he Governor and State Health Commissioner hereby issue this Order prohibiting all inpatient and outpatient surgical hospitals . . . , free-standing endoscopy centers, physicians' offices, and dental, orthodontic, and endodontic offices in the Commonwealth from providing procedures and surgeries that require P[ersonal] P[rotective] E[quipment], which if delayed, are not anticipated to cause harm to the patient by negatively affecting the patient's health outcomes, or leading to disability or death. This does not include outpatient visits delivered in hospital-based clinics.
> This Order does not apply to the full suite of family planning services and procedures nor to treatment for patients with emergency or urgent needs. Inpatient and outpatient surgical hospitals . . . , free-standing endoscopy centers, physicians' offices, and dental, orthodontic, and endodontic offices may

>> perform any procedure or surgery that if delayed or canceled would result in the patient's condition worsening.

(*Id.* Ex. B [ECF No. 1-2].) As a result of the Virginia Order, Plaintiffs contend they lost revenue because they were not permitted to perform certain elective and/or non-emergent procedures at their facilities. They accordingly made a claim under the ICD provision for their losses.[1]

The matter is before the court on Plaintiffs' motion for summary judgment. They allege that, by the plain terms of the policy, the Virginia Order triggered coverage and AGLIC is responsible for its losses. AGLIC disagrees, arguing that the limitations imposed by the Virginia Order in no way triggered the ICD endorsement. On this purely legal question on the interpretation of the policy's language, the matter is ripe for disposition.

## II.

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might

---

[1] The timeline—and subsequent denial—of the ICD claim is interesting, if ultimately irrelevant. In a nutshell, at the time Plaintiffs filed the present suit, AGLIC asserted that it had not "denied" the claim, but instead was still collecting information to make a determination. Because the policy contained a one-year limitations period to bring suit, Plaintiffs alleged a constructive denial of their claim. The court ultimately gave AGLIC a short period to make a decision on the claim, which it ultimately denied, making Plaintiffs' claim in this court ripe.

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Purely legal questions are particularly appropriate for summary judgment, *see Cricket Store 17, LLC v. City of Columbia*, No. 3:13-3557-TLW, 2016 WL 81807, at *3 (D.S.C. 2016) ("[L]egal questions are for the Court to resolve."), but

> [a] court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible to two reasonable interpretations. The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

*Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (cleaned up). "Therefore, summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth. v. Potomac Invest. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).

## III.

For the purposes of this motion only, the parties appear to concede that Virginia law applies. *Accord City Ins. Co. v. Lynchburg Foundry Co.*, No. 88-0178-L, 1989 WL 1102787, at *2 (W.D. Va. Apr. 25, 1989) (citing Va. Code Ann. § 38.2-313 for the proposition that "insurance contracts 'on or with respect to the ownership, maintenance or use of property in this Commonwealth' shall be interpreted according to Virginia law."). And, under Virginia law, an insurance policy is interpreted like any other contract; words are given their ordinary meaning and, if the terms of a disputed provision are "clear and definite," the plain meaning of the words control. *Smith v. Smith*, 351 S.E.2d 593, 595 (Va. Ct. App. 1986).

In this case, the court joins the chorus of courts that have found that governmental shutdown orders—like the Virginia Order—do not implicate the ICD endorsement. *See St. Tammany Parish Hosp. Serv. Dist. No. 2. V. Zurich Am. Insurancy Co.*, No. 21-2204, 2022 U.S. Dist. LEXIS 51774, at *31–42 (S.D. La. Mar. 23, 2022); *HealthPartners, Inc. v. Am. Guarantee & Liab. Ins. Co.*, No. 21-cv-1375, 2022 WL 597518, at *8 (D. Minn. Feb. 28, 2022); *Billings Clinic v. Am. Guarantee & Liab. Ins. Co.*, No. CV 21-32-BLG-SPW-TJC, 2022 WL 773207, at *7–8 (D. Mont. Feb. 22, 2022) (Report & Recommendation), *adopted by* 2022 WL 767108 (D. Mont. Mar. 14, 2022); *Northwell Health, Inc. v. Lexington Ins. Co.*, 550 F. Supp. 3d 108, 118–120

(S.D.N.Y. 2021);[2] *see also Reconstructive Orthopaedic Assocs. II, LLC v. Zurich Am. Ins. Co.*, No. 21-4003, 2022 WL 4586131, at *5–6 (E.D. Pa. Sept. 29, 2022). By its plain terms, the ICD endorsement requires that the government order declare a part of the insured premises "uninhabitable" and "prohibit" access to those locations. The Virginia Order did no such thing. Rather, it required that any procedure that could be safely postponed be postponed to conserve PPE and ensure adequate space to respond to medical emergencies during a global pandemic. No fair reading of the Virginia Order or the policy provision at issue supports any other conclusion.

In *St. Tammany Parish Hospital Service District No. 2 v. Zurich American Insurance Company*, the Eastern District of Louisiana confronted an insurance provision identical to the ICD endorsement here. The court concluded that the plaintiff had "no coverage under the Interruption by Communicable Disease provision of the policy because Plaintiff was not prohibited from accessing any part of its facilities." No. 21-2204, 2022 U.S. Dist. LEXIS 51774, at *31 (E.D. La. Mar. 23, 2022). The same is true here.

Similarly, in *Northwell Health, Inc. v. Lexington Insurance Co.*, the Southern District of New York concluded that the government's COVID rules did not declare any part of the insured premises "uninhabitable" for purposes of ICD coverage under a similar policy. 550 F. Supp. 3d 108, 119 (S.D.N.Y. 2022). That court explained:

> These Orders do not deem uninhabitable or prohibit access to Northwell's facilities—or any healthcare facility, for that matter. To the contrary, the Orders assume that patients will continue to "inhabit" hospitals, regulate the way patients can safely do so, and establish conditions under which members of the public may

---

[2] In *St. Tammany Parish Hospital Services*, *Northwell Health, Inc.*, *Billings Clinic*, and *HealthPartners, Inc.*, the provisions at issue were identical to the ICD endorsement in this case.

> access hospitals and patients. The Orders do not require hospitals to close certain buildings, only to suspend elective procedures; if a hospital wanted to use facilities ordinarily used for elective procedures to conduct emergency ones, nothing in the Orders forbids this. While the Orders certainly restrict access to hospitals, they fall far short of "prohibiting" access.

*Id.* at 119–20. So, too, here. In fact, the Virginia Order expressly *permits* certain procedures to occur: "Inpatient and outpatient surgical hospitals . . . , free-standing endoscopy centers, physicians' offices, and dental, orthodontic, and endodontic offices may perform any procedure or surgery that if delayed or canceled would result in the patient's condition worsening." (Compl. Ex. B.)

Plaintiffs argue that "prohibiting access" in the ICD endorsement really means "restricting access," much like an "Access Prohibited" sign on a military base really means "Authorized Personnel Only." To make this argument, Plaintiffs rely on loose dictionary definitions of the policy language, citing that "'prohibit' means not only 'to forbid' something, but also 'to hinder' something." (Pl.'s Br. in Supp. pg. 16, June 1, 2022 [ECF No. 22].) "The term 'hinder' in turn is defined to mean 'restrain,' 'make difficult,' or 'delay.'" (*Id.*) Thus, they argue, prohibit really means "make difficult," so if the Virginia Order "make[s it] difficult" to access any part of the insured location or "hinders" access to any part of the hospitals, the ICD endorsement is triggered.

But this argument violates the core principles of contract interpretation. The plain terms of the insurance policy contract control, not how those words are understood when used in other contexts (nor when they are swapped about *ad infinitum* for synonyms until a preferred understanding is found). Here, the only reasonable interpretation of the words used are that, for the ICD endorsement to be implicated, portions of the hospitals at issue had to

be deemed "uninhabitable" and that access to those locations had to be "prohibited." The Virginia Order had no such effect, so ICD coverage was not triggered.

## IV.

While the court understands and is sympathetic to the financial strains placed on hospitals by the COVID-19 pandemic, that sympathy cannot extend so far as to distort the plain language of the policy. Plaintiffs' claims are not covered by the ICD endorsement, and its motion for summary judgment must be denied.

The clerk is directed to send copies of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 14th day of November, 2022.

> */s/ Thomas T. Cullen*
> HON. THOMAS T. CULLEN
> UNITED STATES DISTRICT JUDGE